**Mary D. LISCANO, Plaintiff,**

v.

**Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.**

**Cause No. 1:01–CV–399.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Aug. 12, 2002.

Joseph W. Shull, Fort Wayne, IN, for plaintiff.

Deborah M. Leonard, Fort Wayne, IN, for defendant.

### MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

This matter is before the Court[1] for judicial review of a final decision of the defendant, Commissioner of Social Security Administration ("Commissioner"), denying the application of the plaintiff, Mary Liscano ("Plaintiff") for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").

Section 205(g) of the Social Security Act ("the Act") provides, *inter alia*, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision ·complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. § 405(g).

---

1. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

## II. THE PROCEDURAL AND FACTUAL BACKGROUND

### A. The Procedural Background

On February 17, 1998, the Plaintiff filed an applications for DIB and for SSI with a protective filing date of January 22, 1998, alleging an inability to work beginning October 27, 1997. The Plaintiff's claim was denied initially and upon reconsideration. The Plaintiff requested a hearing, and on August 11, 1999, a hearing was held before the Administrative Law Judge Bryan Bernstein ("ALJ"). The Plaintiff was represented by counsel and testified at the hearing. Juanita Marlowe, the Plaintiff's sister, and Christopher Young, a Vocational Expert ("VE"), also testified.[2]

Over one year later, on August 16, 2000, the ALJ issued his decision wherein he made the following findings:

1. The claimant has not engaged in disqualifying substantial gainful activity since October 27, 1997.

2. The medical evidence establishes that the claimant has fibromyalgia an impairment which is severe, but which does not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's statements concerning her impairment and its impact on her ability to work are not reliable.

4. The claimant retains the residual functional capacity to perform light exertional work activity.

5. The claimant is unable to perform her past relevant work.

6. The claimant is 48 years old, a younger individual.

7. The claimant has a high school education.

8. The claimant has unskilled work experience.

9. Based on an exertional capacity for light work, and the claimant's age, educational background, and work experience, Sections 404.1569, 416.969 and Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4, direct a conclusion of "not disabled."

10. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

(Tr. at 25–26.)

Based on these findings, the ALJ determined that the Plaintiff was not entitled to SSI or DIB. The Plaintiff requested review by the Appeals Council, which was denied on August 28, 2001, leaving the ALJ's decision as the final decision of the Commissioner. This appeal followed.

The Plaintiff filed her opening brief on March 2, 2002. On June 27, 2002, the Defendant filed a memorandum in support of the Commissioner's decision, and the Plaintiff filed her reply on July 29, 2002.

### B. The Factual Background

The Plaintiff suffers from fibromyalgia, "a common, but elusive and mysterious" disease, whose "causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and ... [notably] multiple tender spots [sometimes called triggers points] ... that when pressed firmly cause the

---

2. The VE was only asked six questions (and some of those were actually explanatory statements from the ALJ) during the administrative hearing. Indeed, the only subject he testified about was why he had previously indicated that the Plaintiff's former job was at the "medium" residual functional capacity level. (Tr. at 44.)

patient to flinch." *Sarchet v. Chater,* 78 F.3d 305, 306–07 (7th Cir.1996). Some of the medical evidence suggests that the Plaintiff was diagnosed with this condition as early as 1995 or 1996, but the record does not contain any medical evidence until 1997, and none diagnosing her with fibromyalgia until early 1998. Regardless of whether the Plaintiff was diagnosed with fibromyalgia prior to 1997 or 1998, it is clear that the Plaintiff was able to handle the pain associated with the disease until around October or November 1997.

The Plaintiff first saw Dr. John Kennedy, M.D., her future treating physician, on March 21, 1997, complaining of shoulder pain radiating down both arms to the elbows and headaches in the back of the head. (Tr. at 181.) She also reported that both her hands go to "sleep," her vision blurs, and her shoulder and hand pain disrupt her sleep. (*Id.*) Dr. Kennedy's physical examination revealed tenderness upon palpitation of the upper back and shoulders, and both hands had a positive Phalen's and Tinel's sign. (*Id.*) Dr. Kennedy opined that the Plaintiff suffered from cervical strain and myofascial pain syndrome, but not fibromyalgia. (*Id.*)

On November 6, 1997, the Plaintiff saw Dr. Robert Lillo, M.D., for a worker's compensation disability evaluation, and she complained of neck pain traveling into both arms with numbness and tingling in the arms. (Tr. at 159) She related a history of this condition lasting over a year, and reported that it was caused by accumulative job-related trauma. (*Id.*) Although the Plaintiff reported thoracic pain, she denied low back and leg pain. (*Id.*) She reported that she occasionally woke up night with numbness in her hands, that she had difficulty sleeping through the night, and that physical therapy had not helped. (*Id.*) Dr. Lillo's physical examination showed slightly decreased range of motion in the cervical spine, and he noted that she was stiff and resistive to motion. (Tr. at 160.) She was tender throughout the cervical paraspinious muscles as well as in the upper back and rhomboid region, but there was no tenderness over the spinous process. (*Id.*) Carpal compression test was positive on the right. (*Id.*) Dr. Lillo diagnosed the Plaintiff with cervical myofascial pain syndrome. (*Id.*) He recommended a course of Elavil[3] and Cataflam[4] and a more aggressive exercise program with massage therapy. (*Id.*) He opined that as her job is fairly light she could return to it "pretty quickly," but he would keep her off work until she returned for a follow up the next week. (*Id.*)

On November 14, 1997, the Plaintiff returned to Dr. Lillo for a follow up examination. (Tr. at 158.) Dr. Lillo reported that her condition had not changed, and noted that the electrodiagnostic study was borderline abnormal and that she had an unremarkable cervical MRI in the past. (*Id.*) Dr. Lillo opined that the Plaintiff had fibromyalgia. (*Id.*) He noted that the Elavil had helped some, but he asked her change to Effexor[5] to counteract any sleep disturbance caused by it. (*Id.*) He opined that there was no reason to impose any work restrictions on her from a worker's compensation standpoint; however, he believed it would be worthwhile to run some tests on her to see why she continued to have pain. (*Id.*)

---

**3.** Elavil is used to treat symptoms of depression. *Physician's Desk Reference* at 626 (55th ed.2001) (hereinafter *"PDR"*).

**4.** Cataflam is used to treat acute and chronic signs of osteoarthritis and rheumatoid arthritis. *PDR* at 2158.

**5.** Effexor is used to treat depression. *PDR* at 3361

On December 1, 1997, the Plaintiff saw Dr. Kennedy for a follow-up examination. (Tr. at 180.) The Plaintiff complained of shoulder pain and migraines. (*Id.*) She was prescribed Elavil, Darvocet, and Cataflam. (*Id.*)

On December 31, 1997, the Plaintiff returned to Dr. Kennedy for another followed-up examination concerning her shoulder pain and migraines. (Tr. at 179.) Dr. Kennedy referred her to Dr. Gregori, and prescribed a course of Prednisone and Elavil. (*Id.*)

On January 16, 1998, the Plaintiff saw Dr. Robert Gregori, M.D., with complaints of chronic neck, upper back, and lower back pain. (Tr. at 162.) The Plaintiff reported a four-year history with this condition, but indicated that it had progressively deteriorated to the point that on November 27, 1997, it forced her to take sick leave. (*Id.*) The Plaintiff described her symptoms as aching and burning in the neck both anterior and posterior the shoulders, the scapular region of both arms to the hands where she had diffuse numbness and in the low back without radiation into the legs. (*Id.*) She rated her pain between a five and ten on a zero to ten scale, and she stated that pain worsened with exercise, sitting, standing, walking, bending, and by the end of the day she claimed that nothing except Darvocet helped. (*Id.*) Functionally, she saw herself as totally disabled both from homemaking and work. (*Id.*) Dr. Gregori's physical examination revealed that the Plaintiff was somewhat slow with her mobility, and she had a lot of grimacing with palpation. (*Id.*) The Plaintiff had diffuse tender points including the occiput, the super clavicular and the upper trapezoidal region, the posterior cervical region, the subacromial and midhumeral regions, along with tenderness throughout the parascapular, thoracic, lumbar paraspinal regions, iliac crest, and the greater trochanters bilaterally. (*Id.*) Additionally, Dr. Gregori noted slightly reduced lumbar mobility and mildly reduced cervical motion. (*Id.*) The Plaintiff had difficulty elevating her arms over 100˝but had full passive range of motion. (*Id.*) There were no palpable spasms or trigger points. (*Id.*)

Dr. Gregori opined the Plaintiff met the fibromyalgia criteria according to the American College of Rheumatology. (Tr. at 164) He provided her with a fibromyalgia information booklet, and suggested that she try Flexeril [6] at bedtime and Paxil.[7] (*Id.*) He encouraged her to decrease her use of Darvocet. (*Id.*) Finally, he recommended an exercise program of stretching and a general aerobic program. (*Id.*)

On January 26, 1998, Dr. Kennedy prescribed Imitrex [8] for the Plaintiff's migraine headaches. (*Id.*)

On February 11, 1998, the Plaintiff returned to Dr. Gregori for a follow up examination. (Tr. at 161.) She reported that the Flexeril and Paxil caused blurred vision and some diffuse symptoms. (*Id.*) After stopping these, the symptoms resolved, and she was prescribed Remeron [9] by phone, but she complained that it made her feel very drowsy. (*Id.*) Dr. Gregori's physical examination revealed a somewhat flattened affect. (*Id.*) The Plaintiff had persistent multiple tender points with no

6. Flexeril is an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions. *PDR* at 1929.

7. Paxil is used to treat depression, obsessive compulsive disorder, panic disorder, and social anxiety disorder. *PDR* at 3115–3116.

8. Imitrex injections are used for the acute treatment of migraine attacks and the acute treatment of cluster headache episodes. *PDR* at 1400.

9. Remeron is used to treat depression. *PDR* at 2291.

joint swelling, and her cervical and lumbar mobility was mildly restricted. (*Id.*) Dr. Gregori again opined that the Plaintiff suffered from chronic neck, upper back, low back, and extremity pains due to fibromyalgia. (*Id.*) He instructed her to cut back on the Remeron, and he gave her a prescription for Darvocet twice per day. (*Id.*) He also told her to continue walking and to try to get up to three miles five days a week and continue the stretching. (*Id.*)

In a letter dated February 26, 1998, Dr. Kennedy reported to the Plaintiff's employer's insurance company that the Plaintiff was currently unable to work, and although her motivation was good, her prognosis was poor. (Tr. at 177) He was asked to estimate her return to work date, and he indicated "if able 6/1/98". (Tr. at 178)

On April 3, 1998, the Plaintiff saw Dr. Kennedy with complaints of fatigue. (Tr. at 175) Dr. Kennedy noted no change in her condition and kept the Plaintiff on a course of Flexeril.

On April 15, 1998, the Plaintiff saw Dr. Omar Hamoui, M.D., and reported a history similar to that given to Dr. Lillo and Dr. Gregori. (Tr. at 165.) However, she also indicated that she had been taking Amitriptyline for a sleep disturbance, which had helped. (*Id.*) The Plaintiff also reported getting migraines as frequently as every three to four days for which she was taking Imitrex. (*Id.*) Dr. Hamoui's joint examination showed all fibromyalgia trigger points as positive. (Tr. at 166.) She had normal finger movements in bilateral hands and fingers, and she could pick up coins, button buttons, and zip zippers

with no problem; however, he reported quick fatigue which limited repetitive tasks. (Tr. at 168.) Dr. Hamoui concluded that the Plaintiff's fibromyalgia was moderately limiting her lifestyle, and he opined that she might benefit from further pain therapy and conditioning. (Tr. at 166.)

On April 23, 1998, the Plaintiff saw Dr. Henry Martin, Ph.D., for a mental status examination. (Tr. at 169.) She reported that she had been dealing with fibromyalgia and symptoms of aches and pains for the last four years, and that these symptoms had grown worse in the past year. (*Id.*) She reported difficulty with sleeping, and with doing the laundry. (*Id.*) Moreover, the Plaintiff reported that she had to give up many of her activities like bowling, and reading books. (Tr. at 170.) She stated that she often felt discouraged, and she commented, "I can't do what I used to do. I am limited in my activities. I don't consider myself old, but I get discouraged because I can't do what I used to do like dancing, shopping, etc." (*Id.*) She also indicated a couple of symptoms pertaining to depression such as difficulty falling and staying asleep and not being able to enjoy activities form the past. (*Id.*) Dr. Martin diagnosed the Plaintiff with Adjustment Disorder with depressive features.[10] (*Id.*)

On May 5, 1998, the Plaintiff saw Dr. Kennedy, who noted that she had applied for Social Security Disability and was being examined by numerous physicians. Dr. Kennedy rechecked the Plaintiff for fibromyalgia and noted left hip pain and neck pain. (Tr. at 175.) Once again, Dr. Kennedy's primary impression was fibromyalgia. (*Id.*)

---

**10.** The essential feature of an Adjustment Disorder is the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors. There are several subtypes of which depressive features indicate that the predominant manifestations are symptoms such as depressed mood, tearfulness, or feelings of hopelessness. *Diagnostic and Statistical Manual of Mental Disorders* 623 (4th ed. American Psychiatric Association 1994) (hereinafter "*DSM–IV* ").

The Plaintiff returned to Dr. Kennedy on June 3, 1998, for a check-up, and she complained that her hands and arms hurt and that she had developed chest pains. (*Id.*)

On July 15, 1998, the Plaintiff saw Dr. Kennedy, complaining of neck and shoulder pain and blurred vision. (Tr. at 174.) Then, on August 12, 1998, Dr. Kennedy referred the Plaintiff to Dr. Neucks. (*Id.*) Finally, in a handwritten note, addressed to "Whom it May Concern," Dr. Kennedy opined that the Plaintiff "remains totally disabled" by her fibromyalgia. (Tr. at 173.)

On September 24, 1998, the Plaintiff saw Dr. Stephen Neucks. M.D., a rheumatologist, on referral from Dr. Kennedy because of her diffused musculoskeletal symptoms. (Tr. at 239.) The Plaintiff reported that her condition began about three years earlier without any particular provocation or concomitant illness when she developed pain and discomfort in her arm, neck, and shoulder area, and again in October 1997, she had another spontaneous episode of significant pain in her neck, trapezius, and scapula areas; however, this time physical therapy was not helpful and actually exacerbated her condition. (*Id.*) The Plaintiff maintained that she could not stand any touching of these areas, and that heat and cold aggravated her pain. (*Id.*) She described her pain as being present in her neck, trapezius, scapula areas, her arms, hands, pectoralis muscle, and down her low back. (*Id.*) The Plaintiff also complained of early morning stiffness, and she reported significant nighttime pain which would frequently wake her. (*Id.*) Dr. Neucks' physical examination of the Plaintiff showed that her cervical spine had only about 30% to 40% of normal range of motion, with considerable guarding. (*Id.*)

The posterior cervical and trapezius muscles were markedly tender; moreover, the whole trapezius muscle was in spasm. (*Id.*) Dr. Neucks also noted mild tenderness in the lateral neutral shoulder areas, and trigger points were noted also in the thoracic upper, lower lumbar, sacroiliac, lateral and upper lumbar areas. (*Id.*) Dr. Neucks diagnosed the Plaintiff with fibromyalgia that was "quite significant." (Tr. at 241.) Dr. Neucks then started the Plaintiff on Neurontin,[11] continued her on Effexor, and noted that he might try soft tissue injections and gentle range of motion therapy. (*Id.*)

On October 9, 1998, the Plaintiff called Dr. Neuck's office and reported that the Neurontin had made her sleep all day, and she was told to take it at bedtime and call back in one week. (Tr. at 238.)

On October 30, 1998, the Plaintiff returned to see Dr. Neucks, and complained of increasingly severe headaches, neck and shoulder pain which woke her up at night, and fatigue. (Tr. at 237.) She reported that the medicines made her sleep all day, and Dr. Neucks prescribed Zanaflex.[12] (*Id.*)

On November 13, 1998, the Plaintiff returned to see Dr. Neucks complaining of pain in her neck, arms, back, and hips. (Tr. at 234.) And the Plaintiff returned for another visit on December 29, 1998, and Dr. Neucks reported that she continued to do poorly. (Tr. at 228.)

On January 27, 1999, the Plaintiff called Dr. Neucks' office complaining that her arms, hands and shoulders were extremely painful and that Darvocet had not helped. (*Id.*) Dr. Neucks suggested that she try a short asteroidal burst. (Tr. at 224.)

---

11. Neurontin is used as adjunctive therapy in the treatment of partial seizures. *PDR* at 2459.49.

12. Zanaflex is used to help manage spasticity. *PDR* at 671.

However, the Plaintiff called again on January 29, 1999 complaining of all-over pain and that her medications had not helped. (*Id.*) Dr. Neucks then put her on Lortab. (*Id.*)

On January 29, 1999, the Plaintiff also called Dr. Kennedy's office crying and stating that she was having pain all over her body and that the Darvocet was not helping. (Tr. at 197) She also stated that the Prednisone that Dr. Neucks prescribed was giving her problems. (*Id.*)

Later that day, the Plaintiff went to the Marion General Hospital, Emergency Room because of her severe body pain. (Tr. at 187.) The emergency room physician's notes indicate that the Plaintiff was "*cheerful*, rocking back and forth, complaining of being in pain." (*Id.*) (emphasis added). However, this was apparently a mis-transcription of the emergency room nurse's handwritten notes that the Plaintiff was "*tearful*, rocking back & forth. Appears to be in pain." (Tr. at 190.) During the examination, the Plaintiff reported severe pay lasting for three days. (Tr. at 187.) The physical examination revealed that she had some minor tenderness in the neck and soreness everywhere. (Tr. at 188.) The emergency room physician thought that she was on sub-optimal doses of her steroids, and recommended increasing the dosage of Lortab, and diagnosed the Plaintiff with severe somatic (body) pain secondary to fibromyalgia. (*Id.*) She was given an IV of Mepergan.[13] (Tr. at 189).

On February 1, 1999, the Plaintiff saw Dr. Neucks because of her severe incident of fibromyalgia, which required emergency room treatment. (Tr. at 222.) She reported that the Lortab had not helped and that her pain continued. (*Id.*) Dr. Neucks

opined that she had had a fibromyalgic flare, and recommended that she take Oxycontin for the pain.[14] (*Id.*)

On February 5, 1999, the Plaintiff saw Dr. Kennedy concerning her fibromyalgia, and he placed her on Oxycontin. (Tr. at 197.) He noted that she had multiple trigger points. (*Id.*)

On February 12, 1999, the Plaintiff returned to see Dr. Kennedy, this time complaining about a rash on her legs. (*Id.*) Dr. Kennedy concluded the rash was a reaction to the Oxycontin, and he prescribed Ultram for pain. (*Id.*)

On February 18, 1999, the Plaintiff called Dr. Necks's office stating that she was allergic to Oxycontin because it contained codeine, and she noted that it caused a rash on her legs. (Tr. at 219.)

On March 2, 1999, the Plaintiff saw Dr. Neucks to discuss her medications and her rash. (Tr. at 217). Dr. Neucks noted that she had a rash from "head to toe" despite the fact that she was off her medication. (*Id.*) Dr. Neucks referred her to a dermatologist, Dr. Kristin Hess, M.D., who conducted a dermatological test on March 3, 1999. (*Id.*; Tr. at 218.)

Then on March 17, 1999, Dr. Hess opined that the Plaintiff's rash was most likely caused by her medications. (Tr. at 215.) Specifically, Dr. Hess identified Tegretol as the allergen, but she was unable to rule out Oxycontin, Ultram or Effexor. (*Id.*)

On March 18, 1999, the Plaintiff saw Dr. Kennedy with complaints of a sore throat, ear pain, and other flu-like symptoms. (Tr. at 196.)

**13.** Mepergan is a preanesthetic medication used when analgesia and sedation are necessary. *PDR* at 3403.

**14.** Oxycontin is used to manage moderate to severe pain. *PDR* at 2698.

She returned to see Dr. Kennedy on April 29, 1999, complaining about a rash, itch, and bruising on her legs. (*Id.*)

On May 11, 1999, the Plaintiff saw Dr. Neucks, with complaints of neck pain traveling down into her shoulders and arms, and loss of sleep due to the pain. (Tr. at 214.) The physical examination revealed trigger points, especially concentrated around her neck. (*Id.*) Dr. Neucks decided to place the Plaintiff on Serzone.[15]

On May 21, 1999, the Plaintiff called Dr. Neucks, stating that she had had an allergic reaction to Celebrex.[16] (Tr. at 212.) She called again on July 6, 1999, reporting that she had been taken off Effexor, but that she now had a great deal of pain in her fingers, hands, and hips, and she wanted to be placed back on it. (*Id.*). Dr. Neucks then prescribed Effexor. (*Id.*).

On July 8, 1999, the Plaintiff saw Dr. Kennedy for a check-up, and she noted that she still had pain in all of her fingers. (Tr. at 194.)

Then, on July 25, 1999, Dr. Kennedy provided a narrative letter to the Plaintiff's attorney. (Tr. at 193). In it, Dr. Kennedy recounted that he first saw the Plaintiff in March 1997, and that she had, sometime in 1995 or 1996, been diagnosed with fibromyalgia by her previous physician, Dr. Smith. However, in 1997, Dr. Kennedy opined that because her symptoms were not so severe, she only met the requirements for myofascial pain syndrome rather than fibromyalgia. (*Id.*) Nevertheless, he reported that the Plaintiff's symptoms had systematically increased to the point that she has multiple trigger points in the upper and lower back which warrant the diagnosis of fibromyalgia. (*Id.*) Additionally, Dr. Kennedy stated that since she had a "rather severe case [of fibromyal-

gia]," he referred her to Dr. Neucks, "a noted fibromyalgia physician." (*Id.*) Dr. Kennedy stated that the Plaintiff's condition had been quite debilitating for her both in terms of pain, fatigue, and difficulty in sleeping, and that it was difficult to control her symptoms so that she is capable of performing even basic daily activities. (*Id.*) Thus, Dr. Kennedy opined that the Plaintiff was not capable of performing any type of work on a sustained basis (i.e., 8 hours a day, 5 days a week) even with normal rest periods. (*Id.*)

On January 28, 2000, the Plaintiff checked herself into Saint Vincent Hospital's Center for Complementary Medicine and Pain Management (the "Pain Center") for an interdisciplinary approach to managing and treating her fibromyalgic pain. (Tr. at 277–291.) While at the Pain Center, the Plaintiff was evaluated by a physical therapist, a physician, and a psychologist.

In the physical therapy evaluation at the Pain Center, the Plaintiff reported significant limitations on her ability to perform basic everyday activities like housekeeping, cooking, and doing laundry. (Tr. at 280) She also reported a significant amount of difficulty opening pop cans, using eating utensils, and carrying her purse or pushing a shopping cart. (*Id.*) However, she stated that she could drive very short distances. (*Id.*) Indeed, she noted that on a normal day, her pain level was about an 8 or 10, but that number would typically escalate to a 10 on a bad day. The evaluation revealed a limited range of motion: the Plaintiff had a 25% reduction in active lumbar flexion with marked pain in buttocks area, a 25% reduction in cervical range of motion with pain in the back and neck, a 50% reduction in extension

---

**15.** Serzone is used to treat depression. *PDR* at 1019.

**16.** Celebrex is used to treat the signs and symptoms of osteoarthritis and rheumatoid arthritis. *PDR* at 2483.

with pain in the neck, and a 50% reduction in right and left side bending with pain in the neck. (*Id.*) Additionally, the Plaintiff was "extreme[ly] tender[ ]" to light touch in the cervical area and the upper trapezius and mid back areas. (Tr. at 282.)

The Plaintiff was then examined by Dr. William Driehorst, M.D., at the Pain Center. (Tr. at 284–286) Dr. Driehorst noted that the Plaintiff's pain was primarily concentrated in her neck and that it created considerable discomfort at night and disturbed her sleep. (Tr. at 285.) During the physical examination, the Plaintiff was tearful and had a "desperate mood about here." (*Id.*) She was tender in numerous fibromyalgia trigger points, as well as control points in the musculature of the upper arm and forearm. (*Id.*) Dr. Driehorst explained that she would not be able to completely control her pain, but that with physical therapy and opioid medications, she could at least relieve some of the pain. (Tr. at 285–86.)

The Plaintiff also underwent a psychological evaluation by Dr. Jacqueline L. Hess, Psy.D, H.S.P.P., a clinical psychologist at the Pain Clinic. (Tr. at 287–291.) Dr. Hess noted that the Plaintiff was unable to sit for the entire interview because of severe pain, and that the lighting had to be lowered in order for her to endure her headache. (Tr. at 287.) Dr. Hess thought the Plaintiff was experiencing depressed mood and some anxiety reactive to the pain and its effects on her life. (Tr. at 289.) She also noted that the Plaintiff experienced some "brain fog," since she occasionally forgot things, and her attention and concentration sometimes decreased. (*Id.*) Dr. Hess provisionally diagnosed adjustment disorder with depressed and anxious mood. (*Id.*) She felt that the Plaintiff had reacted to a very painful condition which has interfered in significant ways in her life. (*Id.*) Finally, Dr. Hess noted that the patient was a positive woman who appeared to be motivated to do well in the program and to try those things which would have some positive affect on her pain. (Tr. at 291)

On February 10, 2000, the Plaintiff submitted to a functional capacity evaluation ("FCE") at the request of Social Security. (Tr. at 255.) During the FCE, the Plaintiff complained of constant pain throughout her body. (*Id.*) She stated that she never knew from day to day which part of her body would hurt, and on that day she complained of pain in the left shoulder and both arms and hands. (*Id.*) She reported that she also has low back pain, neck pain, and headaches. (*Id.*) A physical examination indicated point tenderness over the bilateral upper trapezius, middle traps, bilateral shoulders, and upper extremities, but no pain in the lower extremities. (*Id.*) The assessment indicated that she could perform light work since she could occasionally reach, bend, squat, and kneel, and could frequently climb stairs and walk. (Tr. at 257) Nevertheless, the physical therapist noted a low validity rate for the FCE. The Plaintiff scored an "equivocal" validity rate of only 49.1% (a rating of 50% or more indicates an "invalid" FCE). (*Id.*) The report indicated that a major source invalidity was the sub-maximal effort she gave during the grip test, BTE testing and heart rate response with static strength testing, and bell curve with grip testing. (*Id.*) For example, the Plaintiff showed inconsistencies with rapid exchange, showing a higher strength level with rapid exchange than with regular static strength testing. (*Id.*) Her BTE testing showed coefficients of variation greater than 14% in one of nearly all of the comparison tests; therefore, the actual percent differences were difficult to determine. (*Id.*) The report concluded that due to the degree of invalidity the actual capacities measured were not very likely to be accurate. (*Id.*)

On March 28, 2000, Dr. Neucks provided a letter to the Plaintiff's attorney. (Tr. at 255–56.) In it, Dr. Neucks noted that her initial physical examination revealed findings consistent with the history of severe cervical spine pain and a decrease in cervical spine motion, marked by tremendous guarding and spasm of the posterior cervical and trapezius muscles. (*Id.*) However, since that time, he notes that he has tried a number of medications, soft tissue injections, and therapeutic trials and processes to control her pain, but none of these efforts have eased her severe discomfort. (*Id.*) Thus, based on the Plaintiff's condition and the failure of medical techniques to adequately control her pain, Dr. Neucks opined that the Plaintiff "presents a consistent and sincere picture of severe pain" that is consistent with fibromyalgia. (*Id.*) Dr. Neucks also reviewed the FCE, and noted that he was unsure how the validity finding was reached. For example he stated that the Plaintiff only failed two of eight nonorganic Waddell's signs, and he questioned whether the validity profiles had been tested on fibromyalgia patients. (Tr. at 247.) Dr. Neucks noted that some (unidentified) medical literature suggests that fibromyalgia patients are incapable of doing repetitive activity; thus, the kind of variation of co-efficient in repetitive testing might then be less reliable in fibromyalgia patients than in others. (*Id.*) In his opinion, the reason for this difference was the incomplete relaxation of muscle spindles which does not allow the muscle a microfraction of rest that occurs in normal individuals permitting them to do repetitive activity. (*Id.*) Moroever, Dr. Neucks noted that during his long treatment relationship with the Plaintiff, she presented herself sincerely and made no attempt to give inappropriate testing performance; therefore, in his opinion the therapist's attempt to invalidate her effort was inappropriate. (*Id.*) Also, he noted she showed significant deficits in endurance during repetitive movement testing which would seem to reinforce his belief that she was incapable of doing repetitive activity. (*Id.*) Finally, Dr. Neucks noted that a review of her social and vocational interests indicate markedly decreased activities commensurate with her complaints, and she had worked a number of years consistently prior to the onset of her pain. (*Id.*) He noted she had been compliant with her medications and willing to proceed with therapy shots, treatment at the Pain Center, and other modalities; furthermore, during her most recent visit, she demonstrated significant findings consistent with severe fibromyalgia on physical evaluation. (*Id.*) Therefore, he concluded that based on these findings she is not capable of gainful employment, even on a sedentary basis. (Tr. at 275.)

## III. STANDARD OF REVIEW

To be entitled to Social Security benefits, the Plaintiff must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). It is not enough for the Plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the Plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff,* 307 F.2d 840, 844 (4th Cir.1962), *cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963); *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill.1979).

A five step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen,* 841 F.2d 710, 711 (7th Cir.1988); *Bowen v. Yuckert,* 482 U.S. 137, 107 S.Ct. 2287, 2290–91, 96 L.Ed.2d 119 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen,* 855 F.2d 503, 504 n. 2 (7th Cir.1988); *Zalewski v. Heckler,* 760 F.2d 160, 162 n. 2 (7th Cir.1985); *accord Halvorsen v. Heckler,* 743 F.2d 1221 (7th Cir.1984). A claimant has the joint burdens of production and persuasion through at least step four, where the individual's residual functional capacity ("RFC") is determined. *Yuckert,* 482 U.S. at 146 n. 5, 107 S.Ct. 2287; 20 C.F.R. §§ 404.1545, 416.945. At step five the Commissioner bears the burden of proving that there are jobs in the national economy the plaintiff can perform. *Herron v. Shalala,* 19 F.3d 329, 333 n. 18 (7th Cir.1994). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

## IV. DISCUSSION

■ Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker,* 732 F.2d 605, 607 (7th Cir.1984) (citing *Whitney v. Schweiker,* 695 F.2d 784, 786 (7th Cir.1982); 42 U.S.C. § 405(g)); *Burnett v. Bowen,* 830 F.2d 731, 734 (7th Cir.1987). "Substantial evidence" has been described as "more than a mere scintilla." *Anderson v. Bowen,* 868 F.2d 921, 923 (7th Cir.1989). It means, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...." *Id.* (quoting *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *see also Allen v. Weinberger,* 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed ... unless there has been an error of law." *Garfield,* 732 F.2d at 607; *see also Schmoll v. Harris,* 636 F.2d 1146, 1150 (7th Cir.1980).

In the present case, the ALJ found that the Plaintiff had not engaged in any substantial gainful activity since the alleged onset date. At step two, the ALJ found that the Plaintiff's impairment was severe; however, the ALJ found that the Plaintiff's impairment did not meet or exceed one of the listed impairments under step three. Under step four, the ALJ found that the Plaintiff was precluded from returning to her past relevant work. However, under step five, the ALJ found that the Plaintiff not disabled based solely on the Medical–Vocational Guidelines (the "Grids").

The Plaintiff contends that the ALJ committed reversible error by (A) incorrectly assessing the Plaintiff's RFC, (b) improperly evaluating the opinions of Dr. Kennedy and Dr. Neucks under the "Treating Physician Rule," and (c) improperly discounting her own credibility.

## A. The ALJ's RFC Assessment is Not Supported by Substantial Evidence

■ The Plaintiff contends that given the subjective nature of fibromyalgia, the

potential inconsistencies of FCEs for fibromyalgia patients, and the ALJ's improper consideration of her daily activities, his conclusion that she is able to perform work at the "light" RFC level is not supported by substantial evidence. The Commissioner, in response contends that the record is replete with substantial evidence supporting the ALJ's RFC determination.

▮▮▮▮ In reviewing the ALJ's decision, we must ensure that the ALJ "sufficiently articulate[d][his] assessment of the evidence to assure us that [he] considered the important evidence and ... to enable us to trace the path of [his] reasoning." *Scott v. Barnhart*, 297 F.3d 589, 2002 WL 1608218, *4 (7th Cir.2002); *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir.1999). Thus, the ALJ must build an "accurate and logical bridge from the evidence to [his] conclusion" so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review. *Scott*, 297 F.3d 589, 2002 WL 1608218, at *4; *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir.2002). In this case, the ALJ's determination falls short of that mark.

First of all, the ALJ may have misunderstood the nature of fibromyalgia and how it correlates with Social Security's rulings. Indeed, in his decision, the ALJ maintains that because the of the "limited nature" of objective findings, there was little objective evidence to support the Plaintiff's claim that she was unable to engage in substantial gainful activity. For example, the ALJ notes that there "was only one isolated one time (*sic*) finding of a muscle spasm, there was a skin disorder, and there were some subjective complaints of decreased range of motion and tenderness, but there were no objective findings supportive of the claimant's extreme allegations of limitation." (Tr. at 20.)

However, as the Seventh Circuit has noted, fibromyalgia's symptoms "are entirely subjective ... [and] there are no laboratory tests for the presence or severity of fibromyalgia." *Sarchet*, 78 F.3d at 306. Indeed, given the subjective nature of the disease, we are particularly troubled by the ALJ's perfunctory rejection of the Plaintiff's subjective complaints and medical findings based on those complaints. Naturally, fibromyalgia patients may exhibit somewhat limited medical signs and findings since the disease must necessarily be evaluated based on subjective responses to testing, however, that does not mean there are no medical signs or findings supporting the Plaintiff's allegations. To handle this type of impairment, Social Security provides in Social Security Ruling ("SSR") 96–4p that while subjective symptoms (i.e., complaints of pain and fatigue) alone are insufficient to establish a disability, *see* 20 C.F.R. §§ 404.1528(a); 416.928(a), those subjective complaints will represent objective "medical signs" (as defined by 20 C.F.R. §§ 404.1528(b); 416.928(b)) when "any of these manifestations is an anatomical [or] physiological ... abnormality that can be shown by medically acceptable clinical or diagnostic techniques[.]" SSR 96–4p n. 2 (citing 20 C.F.R. § 404.1528; 404.1529; 416.928; 416.929).

But despite the requirements of SSR 96–4p, the ALJ made no finding about whether the Plaintiff's subjective symptoms (i.e., complaints of "all over pain" and fatigue) could be shown to be manifestations of fibromyalgia through medically acceptable clinical diagnostic techniques. However, in reviewing that evidence here, we believe there is considerable support for the proposition that the Plaintiff's symptoms and complaints are "medical signs" under SSR 96–4p. Indeed, there is no dispute that the Plaintiff actually has fibromyalgia; the Plaintiff's physicians have repeatedly diagnosed the Plaintiff with fibromyalgia based not only on her

subjective complaints of "all over pain" and fatigue, but also because she has tested positive for the disease during multiple diagnostic trigger point evaluations. (*See, cf.*, Tr at 193, 197, 211, 214, 217, 222, 229, 234, & 237.) Moreover, Dr. Neucks, a rheumatologist and apparently a noted fibromyalgia specialist, noted significant spasms of the Plaintiff's trapezius muscle, leading him to conclude that her fibromyalgia was "quite significant." (Tr. at 241.) Moreover, since the Plaintiff's condition has been diagnosed based on perhaps the only diagnostic technique available, trigger point evaluations, and because subjective complaints of pain and fatigue are generally recognized as manifestations of fibromyalgia, *see Sarchet*, 78 F.3d at 306, under SSR 96–4p, the Plaintiff's complaints may actually rise to the level of objective medical signs that support her claims.

Apart from this, the ALJ misstated the evidence on a number of occasions. For example, in reviewing the January 1999 emergency room records, the ALJ noted that the Plaintiff's "presentation was not consistent with her complaints of pain, as she was reported to be *cheerful.*" (Tr. at 17–18) (emphasis added.) However, while the typed hospital record indicates that the Plaintiff was "cheerful" (*see* Tr. at 187), even the most cursory examination of the record reveals that this is a mis-transcription of the emergency room nurse's observation that the Plaintiff was "*tearful.*" (Tr. at 190.) More importantly, however, the ALJ's statement is somewhat difficult to understand given the context; after all, one who is "rocking back and forth, complaining of being in pain" is rarely (if ever) "cheerful." (Tr. at 187.) Indeed, it appears the ALJ examined this one piece of evidence in a vacuum, ignoring not only the nurse's handwritten notes, but other substantial evidence in the record. For example, two days before the Plaintiff took the relatively drastic step of checking her-

self into the emergency room, she called her rheumatologist complaining about the pain, and then apparently just before she checked in, she called both Dr. Neucks and Dr. Kennedy because the pain was almost crippling. (Tr. at 224, 197.) This evidence certainly supports her contention that she was suffering from severe pain, and thus the ALJ's discussion of her hospital demeanor is clearly erroneous.

Moreover, in reviewing the medical evidence, the ALJ stated that Dr. Neucks' September 1998 examination of the Plaintiff was "*unremarkable* except for a reduced cervical spine range of motion, complaints of tenderness, and a muscle spasm of the trapezius muscle." (Tr. at 18) (emphasis added). However, this description hardly does justice to the evidence, after all, the cervical spine range of motion was reduced by close to 70%, and the spasm in the Plaintiff's trapezius muscle was not an isolated muscular twitch, rather the Plaintiff's entire back was "in spasm," and Dr. Neucks apparently found it severe since he described it as "very impressive." (Tr. at 240–41.) Moreover, while Dr. Neucks noted mild tenderness in the lateral neutral shoulder areas, the Plaintiff had multiple tender (trigger) points in the thoracic upper, and lower lumbar, sacroilic, lateral and upper lumbar areas. (Tr. at 240.) Clearly, these trigger points indicated that the Plaintiff's fibromyalgia was severe, indeed, Dr. Neucks described it as "quite significant." (Tr. at 241.) Moreover, considering that Dr. Neucks never described the Plaintiff's condition as "unremarkable," it appears that the ALJ impermissibly substituted his opinion for that of Dr. Neucks. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir.2001) (ALJ may not substitute his opinion for that of a medical professional).

Additionally, the ALJ noted that the Plaintiff's daily activities demonstrate that

she could perform some light work activities. (Tr. at 23.) For example he notes that the Plaintiff is capable of using a hair dryer, cooking, sweeping, mopping, doing laundry and house cleaning. However, it takes the Plaintiff 1–2 hours to clean her house because she has to take frequent breaks, forcing her to "clean a little & rest then try again" (Tr. at 112). Moreover, apparently the Plaintiff cannot even operate the sweeper since she completely relies on her daughter to do that for her. (Tr. at 58.) Indeed, it is difficult to imagine that someone with difficulties performing these basic chores, who relies heavily on her daughter to accomplish these tasks, and who has to take multiple breaks just to sweep or mop can actually perform light work on a sustained basis for 8 hours a day. See 20 C.F.R. § 404.1512(a); SSR 96–8p (ALJ must evaluate claimants ability to engage in work for 8 hours a day and 5 days a week). Moreover, the ALJ noted that the Plaintiff walked for one mile a day for approximately one hour, but the Plaintiff explained during the hearing that she cannot even walk the length of a football field without feeling severe pain, and clearly she could not sustain this type of activity throughout an eight hour workday.

Nevertheless, the Commissioner argues that other substantial evidence supports the ALJ's decision. Notably, both the Commissioner and the ALJ rely on three opinions by either consultative or one-time examiners. For instance, Dr. Lillo examined the Plaintiff for a worker's compensation evaluation in 1997, but this was before the Plaintiff's pain intensified and before her fibromyalgia symptomology became pronounced. Indeed, this point is reinforced by that fact that at the time both Dr. Lillo and Dr. Kennedy diagnosed the

Plaintiff with myofascial pain syndrome rather than fibromyalgia. (Tr. at 160; 193.) Moreover, while Dr. Gregori suggested that the Plaintiff walk up to three to five miles a day, the efficacy of that suggestion is in doubt since the Plaintiff testified she could barely walk 100 yards. Finally, the Commissioner argues that the Plaintiff was not disabled since both Dr. Lillo and Dr. Hamoui's examinations showed no joint swelling. However, the Commissioner's reliance on this evidence is completely misplaced since swelling is not a symptom of fibromyalgia, and is not indicative of whether the Plaintiff is disabled by that disease. See Sarchet, 78 F.3d at 307 ("[s]ince swelling is not a symptom of fibromyalgia, its absence is no more indicative that the Plaintiff's fibromyalgia is not disabling than the absence of headache is an indication that a patient's prostate cancer is not advanced.").[17]

All of this leads to the particularly troubling observation that the Plaintiff's fibromyalgia involved a number of serious non-exertional impairments, yet the ALJ never solicited any testimony from the VE about whether the Plaintiff was capable of performing a full range of light jobs, or what jobs the Plaintiff could actually perform in the national or regional economy. Rather, the ALJ simply relied on the Grids to find the Plaintiff not disabled, even though the VE was present at the administrative hearing and presumably could have testified. Indeed, 20 C.F.R. § 404.1569a provides that when a claimant's impairments and symptoms cause more than just exertional limitations (i.e., limitations on sitting, standing, walking, lifting, carrying, pushing and pulling) then the ALJ cannot solely rely on the Grids. These so-called nonexertional impairments that require

---

17. The Plaintiff also faults the ALJ for relying on a nearly invalid FCE, since there is allegedly a debate over whether FCEs accurately gauge a fibromyalgia patient's ability to perform work. However, we do not believe the ALJ erred by noting that the FCE was nearly invalid. Thus, since this issue does not alter our analysis, we will not discuss it further.

VE testimony are defined as "certain mental, sensory, or skin impairments" or "impairments [which] result solely in postural and manipulative limitations or environmental restrictions," 20 C.F.R. Part 404, Subpart P, Appendix 2, Section 200.00(e), and include such things as mental limitations like the effects of depression, fatigue, pain, tenderness, numbness and muscle spasms. *See Allen v. Sullivan,* 977 F.2d 385, 389 (7th Cir.1992); SSR 83–14. While these nonexertional impairments are precisely what the Plaintiff complains about, the ALJ did not acknowledge that the Plaintiff suffered from them in any way. Indeed, under Step 5 of the sequential analysis, the ALJ only considered whether the Plaintiff had the exertional capacity to perform light work without discussing the Plaintiff's nonexertional limitations, which significantly reduced her ability to engage in a full range of light work. Thus, because the Plaintiff suffers from severe nonexertional impairments, the ALJ's reliance on the grids alone was clearly erroneous.[18] The ALJ should have elicited testimony from the VE about what jobs the Plaintiff is capable of performing given both her exertional and nonexertional limitations. The ALJ's failure to comply with 20 C.F.R. § 404.1569a, requires us to remand this case for a proper Step 5 determination. *See* 20 C.F.R. § 404.1569a(c) & (d).

Accordingly, ALJ's RFC assessment is not supported by substantial evidence.

## B. The Treating Physician Rule

The Plaintiff also contends that the ALJ improperly evaluated the medical opinions of his treating physicians, Dr. Neucks and Dr. Kennedy.

■ Social Security requires a two-prong evaluation of the medical opinions of treating physicians. First, under what is known as the "Treating Physician Rule," [19] the medical opinion of a treating physician must be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. *McGraw v. Apfel,* 87 F.Supp.2d 845, 853 (N.D.Ind.1999). Second, even if the opinion is not entitled to controlling weight, the physician's opinion is still entitled to deference and must be weighed using the factors set out in the regulations.[20] *Id.* The regulations also provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." *Id.* Nevertheless, "the final decision on whether a claimant is disabled or not is a legal one rather than a medical one, and it is for the ALJ to make that decision." *Kapusta v. Sullivan,* 900 F.2d 94, 97 (7th Cir.1989).

### 1. The ALJ Improperly Discounted Dr. Neucks' Opinion

■ In his decision, the ALJ found that Dr. Neucks' opinion that the Plaintiff was *incapable of even sedentary work was not* entitled to "controlling weight" because it was inconsistent with some other evidence and lacked supporting objective findings. Moreover, the ALJ appears to criticize Dr.

---

**18.** While the ALJ does not have to resort to VE testimony if the nonexertional impairments do not restrict a full range of work at a given occupational level, since the ALJ made no such finding here, this exception does not apply. *See* 20 C.F.R. § 404.1569a(c) & (d).

**19.** Codified at 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2); Social Security Ruling 96–2p.

**20.** The factors cited include: the length of treatment relationship and frequency of examination; nature and extent of the treatment relationship; supportability (e.g., medical signs and laboratory findings); specialization; and other factors. *See* 20 C.F.R. 404.1527(d)(2)-(d)(6).

Neucks for relying on the Plaintiff's subjective complaints to reach his conclusions. (Tr. at 23.)

However, in reviewing the evidence, we believe that Dr. Neucks' opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence. Indeed, as the Seventh Circuit explained in *Sarchet,* perhaps the only diagnostic technique to test for fibromyalgia is to test the patient's 18 trigger points. *Sarchet,* 78 F.3d at 306–07. Here, Dr. Neucks, a noted fibromyalgia specialist, did precisely this, and ultimately determined that the Plaintiff was severely limited in her ability to work. Additionally, while the ALJ discounted Dr. Neucks' opinion as lacking objective findings, as discussed *supra,* under SSR 96–4p, the Plaintiff's symptoms may actually constitute objective medical signs supporting Dr. Neucks' opinion. Accordingly, the ALJ's opinion discounting Dr. Neucks' opinion is not supported by substantial evidence.

Moreover, even if not entitled controlling weight, the ALJ should have at least discussed what weight Dr. Neucks' opinion was entitled to based on the factors provided in 20 C.F.R. § 404.1527(d)(2)-(6). Indeed, SSR 96–2p states:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," *not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.*

SSR 96–2p, 61 F.R. 34490, 34491 (July 2, 1996). These factors include: (1) the length of the treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)-(6); 416.927(d)(2)-(6).

Here, because the ALJ failed to discuss any of these factors, we are unable to determine his reasoning or the amount of weight actually afforded to Dr. Neucks' opinion.[21] *McGraw,* 87 F.Supp.2d at 853; *Schaal v. Apfel,* 134 F.3d 496, 505 (2d Cir.1998). However, our review of the evidence indicates that Dr. Neucks' opinion was entitled to considerable deference. After all, Dr. Neucks has repeatedly treated the Plaintiff since 1998 as the Plaintiff's treating rheumatologist. Indeed, not only is Dr. Neucks a rheumatology specialist, but it also appears he has considerable expertise in treating fibromyalgia patients in particular. Additionally, as discussed *supra,* under SSR 96–4p, Dr. Neucks' opinion is supported by considerable medical signs and he reached his conclusions after repeated trigger point evaluations.

Accordingly, the ALJ decision discounting the opinion of Dr. Neucks is not supported by substantial evidence.

## 2. The ALJ Improperly Discounted Dr. Kennedy's Opinion

The Plaintiff also argues that the ALJ improperly discounted Dr. Kennedy's opinion. In his decision, the ALJ determined that Dr. Kennedy's opinion was not entitled to controlling weight because it was not consistent with objective findings

---

**21.** Indeed, it appears that the ALJ, without saying so, may have actually afforded Dr. Neucks' opinion no weight whatsoever.

and because it relies heavily upon the Plaintiff's subjective complaints. However, as discussed in detail *supra,* under SSR 96–4p, the Plaintiff's own subjective complaints may actually serve as objective medical signs supporting Dr. Kennedy's opinion, and Dr. Kennedy, like Dr. Neucks, based his opinion, in part, on diagnostic trigger point techniques.

Moreover, even if his opinion is not entitled to controlling weight, it is still entitled to deference, and the ALJ failed to evaluate his opinion according to the 20 C.F.R. §§ 404.1527(d); 416.927(d) factors. *See* SSR 96–2p. Indeed, there is no indication that the ALJ considered any of these factors, and it appears that the ALJ, without explanation, actually afforded Dr. Kennedy's opinion no weight at all. Accordingly, the ALJ's decision discounting Dr. Kennedy's opinion is not supported by substantial evidence.

## C. The ALJ's Credibility Determination is Not Supported by Substantial Evidence

Finally, the Plaintiff contends that the ALJ erred in finding her testimony incredible. In finding the Plaintiff's testimony incredible, the ALJ noted several factors.

For example, he stated that her allegations were not supported by any objective medical evidence. However, as discussed *supra,* under SSR 96–4p the Plaintiff's symptoms may constitute objective medical signs, which actually support of the Plaintiff's testimony.

Moreover, the ALJ noted that the Plaintiff's testimony was incredible because she had made an "unwarranted" attempt to secure worker's compensation benefits in 1997, despite the fact that she was diagnosed with fibromyalgia in 1995. However, if the Plaintiff was actually diagnosed with fibromyalgia in 1995, that evidence is

not part of the record. Moreover, as the Plaintiff points out, she successfully pursued long term disability through her employer, thus making the ALJ's "unwarranted" language, frankly, unwarranted. Indeed, it is not always easy to determine whether symptoms like pain and fatigue are caused by workplace activities or not, and the fact that the Plaintiff pursued worker's compensation should not be held against her.

Moreover, the ALJ found her testimony regarding activities like walking and visiting with friends to be inconsistent with prior reports concerning the same activities. However, SSR 96–7p recognizes that symptoms rarely remain static, and often may deteriorate or improve with time. Thus, Social Security requires the ALJ to review the record to determine whether the Plaintiff's condition has changed. However, the ALJ here did not review the record as required by SSR 96–7p, but instead, he simply took the so-called inconsistency as evidence of incredibility.

The ALJ also faults the Plaintiff for indicating in 1998 that she had only been diagnosed with fibromyalgia for 6 months when she had actually been diagnosed with the disease in 1995. However, as previously mentioned, there is simply no evidence in the record dating from 1995, and only an oblique reference (which may or may not be factually accurate) from Dr. Kennedy indicating that a Dr. Smith had opined that the ·she had fibromyalgia in 1995 or 1996. (Tr. at 239.) But Dr. Smith's opinion is shaky considering that Dr. Kennedy provided a differing second opinion that the Plaintiff suffered from myofacial pain syndrome rather than fibromyalgia. (*Id.*)

Additionally, the ALJ stated "[d]uring an emergency room visit on January 29,

1999, for complaints of total body pain, the claimant was reported to be cheerful while complaining of being in pain, which reflects the extreme level of her inconsistencies." (Tr. at 21.) However, the Plaintiff should not be faulted for the ALJ's failure to fully examine the record, since, as discussed *supra*, "cheerful" was an apparent mistranscription of "tearful." (Tr. at 190.)

Finally, the ALJ claims that the Plaintiff's testimony is incredible because she claimed she was bedridden after the FCE, while a physical therapist's follow-up note states only that she had trouble getting out of bed. (Tr. at 21.) The ALJ's conclusion apparently rests on a physical therapist's note, which reads in full: "Mary Liscano. Very sore, difficulty sleeping took pain meds—difficulty getting out of bed." (Tr. at 294.) Stated simply, having difficulty getting out of bed is not necessarily inconsistent with being bedridden.

Thus, in reviewing the record, the ALJ's credibility determination is clearly not supported by substantial evidence.

### CONCLUSION

For the foregoing reasons, the decision of the ALJ finding the Plaintiff not disabled is not supported by substantial evidence, and this case is hereby REMANDED for further consideration.