Michael D. HUGHES, Plaintiff–
Appellant,

v.

Jo Anne B. BARNHART,
Defendant–Appellee.

No. 02–2630.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 29, 2003.

Decided Feb. 20, 2003.

Before COFFEY, EASTERBROOK, and KANNE, Circuit Judges.

ORDER

Michael D. Hughes suffers from a collection of pulmonary dysfunctions, a bipolar depressive disorder with periods of mania, a cocaine addiction, and, since a car wreck in 1999, lower back and hip pain. In May 1998, he applied for Title II disability insurance benefits under 42 U.S.C. § 423. The Social Security Administration ("SSA") denied his claim initially and after a hearing before an administrative law judge ("ALJ"). When the SSA's appeals council declined to review his case, Hughes sought judicial review pursuant to 42 U.S.C. § 405(g). The district court found that the SSA's disability determination was supported by substantial evidence. We affirm.

*BACKGROUND*

Hughes was born in 1967, making him just shy of 32 years-old when he applied for benefits. Since childhood, Hughes has suffered from asthma as well as apparent attention deficit hyperactivity disorder ("ADHD") (R. at 139.) He began ingesting cocaine at age sixteen and drinking at age eighteen; these habits became addictions. Although he seems to have gained some control over his drinking, his cocaine abuse has persisted: his last reported binge contributed to a psychiatric hospitalization in July 2000. (*Id.* at 267.)

Hughes has worked in a variety of occupations. From 1992 until 1996 he was employed as a welder. He quit that job and moved to Chicago after he met his current wife, with whom he has one four year-old child and an eleven year-old step-

child. (*Id.* at 80–81.) In Chicago, he started a wood-floor installation business, which he maintained through 1997. After that he worked as a fabricator, welding together steel components. Then, in September 1998, he returned to installing wood floors, which he did until December 14, 1998. (*Id.* at 105.)

Hughes admitted himself to the emergency room on December 14, complaining of shortness of breath and severe chest pressure. X-rays and examinations showed that he was suffering from moderate hypoxemia (low levels of oxygen in the blood) and "bilateral central pulmonary infiltrates," which are unexplained growths in the lungs. He was hospitalized for procedures to more closely examine his lungs (bronchioscopies); the procedures led to a tentative diagnosis of bronchiolitis obliterans (chronic inflammation of the bronchioles, or terminal branches of the trachea), with "organizing pneumonia." The condition was likely exacerbated by fumes from the chemicals Hughes used in his wood-flooring business. (*Id.* at 144–49, 174.) Although Hughes was released from the hospital on December 18, he was readmitted the following month for three days for substantially the same problems.

On May 5, 1999, Hughes filed for disability insurance, alleging that he had been unable to work since December 14, 1998, due to his ongoing respiratory problems. On September 3, 1999, an SSA consultative physician, Dr. Boyd McCraken, completed a Residual Functional Capacity ("RFC") Assessment. Dr. McCracken concluded that Hughes maintained the RFC to lift 50 pounds occasionally and 25 pounds frequently; stand or walk for six hours in an eight-hour work day; and sit for six hours. (*Id.* at 227.) Only one other limitation was established: Hughes could not work around fumes that might exacerbate his respiratory problems. Based on Dr.

McCracken's assessment, a SSA disability claims specialist found that although Hughes could not return to his job as a wood-floor installer, there were a significant number of jobs, like parimutuel cashier and sleeping car attendant, which he could perform. (*Id.* at 113.) The SSA thus denied Hughes's claim on September 15, 1999.

Hughes challenged the decision, and expanded on his allegedly disabling conditions to include manic depression and back pain attributable to a car wreck that occurred in August 1999. (*Id.* at 116.) In January 2000, Hughes met with Dr. Nelson, a SSA consultative psychiatrist. Dr. Nelson reported that Hughes stayed in bed all day twice a week, had "no current hobbies, interests or activities," and was suffering from depression and a personality disorder. (*Id.* at 245–48.)

In February 2000 a consultative psychologist, Dr. Tomassetti, reviewed Hughes's file and completed a mental residual functional capacity ("MRFC") worksheet. (*Id.* at 253.) Dr. Tomassetti determined that Hughes suffered from a depressive disorder that caused a "pervasive loss of interest in almost all activities," sleep disturbances, and decreased energy. (*Id.* at 256.) Dr. Tomassetti also saw evidence of a personality disorder and cocaine addiction. (*Id.* at 258–59.) The cumulative effect of these disorders, concluded Dr. Tomassetti, was that Hughes was slightly restricted in his daily activities, had moderate difficulties in maintaining social functioning, and often had deficiencies of concentration, persistence or pace. In addition, Hughes's condition moderately limited his ability to maintain attention and concentration for extended periods, to complete a normal workweek without absences, to get along with coworkers, and to set realistic goals for himself. (*Id.* at 258–63.) Dr. Tomassetti con-

cluded with the observation that Hughes had some limitations but could still work.

In February 2000 a disability determination specialist ("DDS") determined that a person with Hughes's mental impairments could not function "above the level of unskilled work." (*Id.* at 125.) There were, however, "a sufficient number of jobs within the occupational base ... to provide the claimant with a reasonable expectation of employment." (*Id.*) Based on these and other reports, the SSA again denied Hughes's claim. Hughes sought a hearing before an ALJ.

Before the hearing, Hughes submitted collections of psychological reports that more fully described his mental condition. The reports reveals that in August 1998, Dr. Daniel Wyma admitted Hughes to a psychiatric hospital for ten days, diagnosing him with manic depression and probable ADHD. At the time of admission Hughes was in a manic phase, with racing thoughts, an inability to sleep, and hyperactivity. The doctor also noted in his psychiatric discharge summary that Hughes had been gambling excessively before his admission. (*Id.* at 139.)

Hughes saw Dr. Wyma on a regular basis in 2000. (*Id.* at 283–294.) Progress notes between February and November 2000 reveal that Hughes had partial success in combating his cocaine addiction. But they also show periodic relapses into behavior, such as gambling, that Dr. Wyma characterized as deleterious to Hughes's mental condition. (*Id.* at 282.) One such relapse resulted in Hughes's second psychiatric hospitalization for mania in July 2000. Dr. Wyma's discharge summary from that hospitalization reports that Hughes had discontinued his medication (Depakote), relapsed into cocaine abuse, and was possibly deeply involved in gambling activities. (*Id.* at 267–271.)

Apart from reports about his mental condition, Hughes also provided the ALJ with medical records concerning his lower back pain, which was likely attributable to a car wreck in August 1999. In February 2000 Hughes embarked on a course of treatment for this back pain, which he estimated at a 3 or 4 but sometimes a 10 on a 10–point severity scale. (*Id.* at 297.) X-rays and examinations at a pain clinic revealed some desiccation of the discs in his lower back, mild spurring and bulging, and a mild herniation. (*Id.* at 298.) Treatment consisted of repeated injections of analgesics into the lower back and radio-frequency rhizotomy, which burns nerve endings. Hughes reported that the pain was significantly reduced for a time after these treatments, but that it always returned. (*Id.* at 298–363.) The last reported treatment occurred in November 2000.

A hearing before an ALJ was held on January 10, 2001. Hughes, his wife, and a Vocational Expert ("VE") testified. Hughes described how bouts of depression had cost him a number of jobs, most recently a position as a general contractor remodeling a house for three or four weeks in the summer of 2000. (*Id.* at 38.) He also claimed that his back pain prevented him from lifting more than 12 pounds, that he became short of breath after only mild exertion, and that he could not sit longer than 35 minutes without getting uncomfortable. (*Id.* at 39–41.) Hughes's wife testified that he was extremely lethargic due to the psychiatric medications, that she sometimes feared leaving the children with him because of his extreme lethargy, and that he quickly became "overwhelmed" whenever he tried to accomplish a task. (*Id.* at 48–50.)

The VE then testified. She first characterized Hughes's past work as a fabricator as medium in physical demand and semi-

skilled, and his past work as a wood-floor installer as heavy in physical demand and semi-skilled. (*Id.* at 55.) Then, asked whether a 33 year-old man who could lift 50 pounds occasionally and 25 pounds frequently could return to a job as a fabricator, the VE agreed that he could. (*Id.* at 57.) When the ALJ supplemented the hypothetical with mental limitations—such as moderate limitations in the ability to complete a normal work week without absences and deficiencies in concentration and pace—the VE opined that a hypothetical claimant so limited could neither return to past work nor find other work in the national economy. (*Id.* at 58.)

Applying the five-step analysis,[1] the ALJ denied Hughes's claim. First, relying partially on his mistaken belief that Hughes had claimed to be disabled since January—rather than December—1998, the ALJ found that Hughes had engaged in substantial gainful activity after the alleged disability onset date. But the ALJ did not deny benefits on this basis; he instead continued with the analysis. At step two, the ALJ determined that Hughes's impairments were severe. At step three, he held that they did not meet or equal a listed impairment. At step four, the ALJ held that Hughes possessed the RFC to perform work requiring medium physical exertion and the MRFC to perform unskilled work. He concluded from this that Hughes could return to his past work. Alternatively, the ALJ held that Hughes was not disabled because the "Commissioner can show that other jobs exist in the national economy which the

claimant can perform." (Step 5). Finally, the ALJ applied the "Grid" (Rule 203.28 of the Medical–Vocational Guidelines, Table No. 3), which, considering Hughes's characteristics and physical impairments, directed a finding of "not disabled." (*Id.* at 23.)

## ANALYSIS

We will uphold the Commissioner's decision if it is supported by substantial evidence and free of legal error. *See Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir.2002). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.2002) (quotations omitted). We also require that ALJs' opinions contain "accurate and logical bridge[s]" between evidence and conclusions. *See Zurawski,* 245 F.3d at 887.

Attempting to overcome this deferential standard, Hughes argues on appeal that 1) the ALJ's finding that he was not entirely credible was patently wrong; 2) the ALJ had no rational reason to reject the VE's testimony; 3) the ALJ erred by refusing to give controlling weight to the opinions of Hughes's treating physician, Dr. Wyma; 4) the ALJ improperly determined that Hughes was not disabled because he abused cocaine; and 5) the ALJ mischaracterized facts from the record.

## I.

Among Hughes's many arguments on appeal, his strongest contention is that the ALJ indefensibly found him not to be cred-

---

1. The five-step analysis consists of five familiar questions: 1) whether the claimant is presently employed; 2) whether the claimant's impairment is severe; 3) whether the impairment meets or equals one of the list of specified impairments contained in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) whether the claimant is unable to perform his past relevant work; and

5) whether the claimant is capable of performing any work in the national economy. *See* 20 C.F.R. § 416.920(b)-(f). The burden of proof is on the claimant through Step 4, but at Step 5 the Commissioner bears the burden of establishing that work which the claimant can perform exists in the national economy. *See Zurawski v. Halter,* 245 F.3d 881, 885–86 (7th Cir.2001).

ible. The ALJ's main credibility determination is indeed somewhat puzzling:

> Claimant's testimony, to the extent that he is alleging disabling conditions, much more disability [sic] independent of substance abuse, is not credible when compared against the objective evidence and factors in SSI 96–7p. Of particular note is his ability to work for lengthy periods in the past while bingeing [sic] on alcohol and cocaine heavily. . . . While he also has a bipolar disorder, he has gone years without treatment and, even when prescribed medications, is not always compliant.

(*Id.* at 22.)

■ Although we are at a loss to explain why the ALJ based his credibility finding upon Hughes's ability to work while doing cocaine, Hughes's failure to take the medication prescribed for his manic-depression does lend some support to the ALJ's credibility determination. *See, e.g., Ostronski v. Chater,* 94 F.3d 413, 419 (8th Cir.1996) (failure to take medication for pain undercuts claimants credibility); *Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir.1989) (same). This is, however, fairly weak support, as failing to take psychiatric medications, which often have powerful side-effects, is a far cry from failing to take over-the-counter analgesics. If there were nothing else supporting the ALJ's credibility determination, we might have vacated the decision and remanded the case. *See Brindisi,* 2003 U.S.App. LEXIS 266 at *11–12, 315 F.3d at ———–———; *Steele,* 290 F.3d at 942 (basing reversal in part upon ALJ's unreasoned discounting of applicant's testimony regarding physical limitations, which conflicted with physician's opinion). But there are other portions of the ALJ's opinion where he notes conflicts between Hughes's testimony regarding his disabilities and his reported activities, such as remodeling the basement of his home and late-night gambling. These conflicts, coupled with Hughes's failure to take his medication, adequately support the ALJ's credibility determination.

### II.

■ Hughes also argues that the ALJ had no rational reason to reject the VE's testimony that there were no jobs for a person with Hughes's physical and mental limitations. Although this testimony is Hughes's strongest evidence of disability, he limits his argument concerning it to the bald assertion that the ALJ "has failed to build a 'bridge' between the evidence upon which he relies and the conclusions he draws therefrom." (Pl. Br. at 20.) We require "that an issue to be preserved must be developed and not merely mentioned." *Johnson,* 189 F.3d at 562.

Even if this argument has not been waived, it is unpersuasive in its current form because the ALJ explained why he rejected the VE's testimony: he thought that his own hypothetical to the VE did not accurately present Hughes's limitations. The ALJ's hypothetical drew upon Dr. Tomassetti's MRFC determination, which noted that Hughes's limitation in completing a normal work week without interruption and in maintaining concentration. The ALJ discredited Dr. Tomassetti's MRFC determination, however, because it was based in part on an interview Hughes had with Dr. Nelson. During this interview, Hughes had claimed to have no current interests or hobbies. The ALJ apparently thought this response concealed gambling activities in which, the ALJ believed, Hughes was at the time engaged. Because Hughes had concealed activities from Dr. Nelson, and Dr. Tomassetti had relied on Dr. Nelson's inaccurate report when determining Hughes's MRFC, the ALJ's own hypothetical based on these reports was in its turn also inaccurate.

The ALJ therefore discounted the VE's response to that hypothetical in favor of the DDS's determination that Hughes could work. This reasoning might be shaky—one could ask why the DDS's opinion, which was also based on Dr. Tomassetti's report, was any more reliable than the VE's opinion—but shaky reasoning does not necessarily equal no reasoning.

Hughes's brief also contains an argument under the heading "The ALJ erred by drawing speculative ... conclusions about the DDS's use of a consultative psychiatric report." In this argument, he attacks the ALJ's finding that he concealed gambling activities from Dr. Nelson, who reported that Hughes had "no *current* hobbies, interests, or activities" (emphasis added). Hughes argues that there is no evidence that he was involved in gambling *at the time* he spoke to Dr. Nelson, so the ALJ had no basis to find that he was concealing such activities.

Although the record might support this contention, and this contention might in turn have supported Hughes's attack on the ALJ's treatment of the VE's testimony, Hughes, who has counsel, makes no effort to link the two points. That results in waiver of the issue. *See Smith v. Eaton,* 910 F.2d 1469, 1471 (7th Cir.1990) (court has "stated repeatedly that [it] cannot be called upon to supply the legal research and organization to flesh out a party's arguments"); *see also Head Start Family Educ. Program v. Cooperative Educ. Serv. Agency 11,* 46 F.3d 629, 635 (7th Cir.1995).

*III.*

■ Hughes contends that the ALJ erred by refusing to give controlling weight to the opinion of his treating physician, Dr. Wyma. Apparently, Hughes believes that the ALJ should have found him disabled because Dr. Wyma pronounced in a letter to Hughes's attorney that Hughes was "disabled and poorly functional." As the regulations make clear, however, a "statement by a medical source that you are 'disabled' or unable to work does not mean that we will determine that you are disabled." *See* 20 C.F.R. § 404.1527(e)(1); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir.2000). Aside from the ALJ's proper rejection of Dr. Wyma's conclusion regarding Hughes's disability, it appears that the ALJ relied heavily on Dr. Wyma's opinions, which he repeatedly cites to support his findings. Furthermore, Dr. Wyma's letter is not as supportive to Hughes's case as he construes it; the doctor notes in it that distinguishing Hughes's possible psychiatric problems from his long-term and continuing cocaine abuse was impossible, which casts doubt on Hughes's manic-depressive diagnosis.

*IV.*

Hughes's fourth argument is that the ALJ did not follow the Commissioner's directive that the SSA first make a disability determination irrespective of substance abuse, and only afterwards consider how substance abuse impacts the claimant's ability to work. *See* 20 C.F.R. § 404.1535.[2]

---

**2.** (a) *General.* If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.

(b) *Process we will follow when we have medical evidence of your drug addiction or alcoholism.* (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.

(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would re-

According to Hughes, the ALJ did not follow that procedure in his case, and instead decided that his cocaine abuse compelled a finding of not disabled.

We have not expressly construed § 404.1535 to require the procedure Hughes outlines. We have, however, held that if an ALJ determines that a claimant can work *in spite* of substance abuse, § 404.1535 is not implicated. *See Maggard v. Apfel,* 167 F.3d 376, 379 (7th Cir. 1999). That is what happened in this case. The ALJ found that Hughes could work, even when he was abusing cocaine: "Of particular note is [Hughes's] ability to work for lengthy periods ... while bingeing [sic] on alcohol and cocaine heavily ...". (R. at 22.) At another point the ALJ reports that "except when abusing cocaine, claimant can perform even semi-skilled work, including past relevant work." (R. at 21.). These two statements are not contradictory (as Hughes contends): In the first the ALJ finds that Hughes could work even while binging on cocaine; in the second the ALJ notes that it is possible that cocaine abuse might interfere with Hughes's ability to perform *semi-skilled* work (as opposed to all work).

*V.*

Hughes's remaining arguments relate to ways in which the ALJ supposedly mischaracterized the record or propounded "fiat conclusions." These arguments are frivolous. Hughes notes, for example, that the ALJ's opinion mistakenly posits January 18, 1998, as the alleged onset date of disability. The opinion then remarks—in relation to Step 1 of the sequential analysis (whether the claimant is working)—on the significant amount of work Hughes performed between January 18 and the real alleged onset date of December 14, 1998. But the ALJ explicitly stated that he was not denying benefits at Step 1 based on this work, and he proceeded with the sequential analysis. Hughes's observation is thus correct but irrelevant.

Hughes is also offended by the ALJ's citation without page number to record entry 17F, which is a 15–page psychological report. Although it is true that administrative law principles require that an ALJ—and not the Commissioner's lawyers or a reviewing court—supply reasons for his or her decision, *Steele,* 290 F.3d at 941, it is also true that we give the opinion "a commonsensical reading rather than nitpicking at it." *Johnson v. Apfel,* 189 F.3d 561, 564 (7th Cir.1999). It would be nitpicky in the extreme to reverse because the ALJ did not provide what amounts to a pin-cite to a specific page in record entry 17F.

Also frivolous is Hughes's attack on the ALJ's conclusion that Hughes's impairments did not meet or equal the listings. The ALJ adequately supported his conclusion:

> The record, however, fails to establish an impairment, or a combination of impairments that meet or equal the level of severity for any impairment enumerated in the Listings at Appendix 1, Subpart P, at 20 C.F.R. 404. For example, his asthma has not resulted in attacks occurring, despite prescribed treatment, as frequently as required by Section 3.03, or documented by pulmonary function studies with results equivalent to that required under the tables associated with section 3.02(a). In addition, he does not have a back or other musculo-skeletal impairment accompanied by the

main if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.

. . .

20 C.F.R. § 404.1535.

signs and findings required under Listing 1.05 or any other listing. Finally, his mental impairment does not meet the requirements or equal the level of severity contemplated under Listing 12.04, for an affective disorder, or Section 12.09, pertaining to a substance abuse disorder. Moreover, his impairments are not shown in combination to meet or equal a listed impairment, a conclusion consistent with the medical evidence as well as his wide range of activities. . . .

While Hughes claims that this determination was overly conclusory, we have upheld an ALJ's less-detailed Step 3 determination. *See Pope v. Shalala,* 998 F.2d 473, 481 (7th Cir.1993). And even under more recent cases, which seem to scrutinize ALJs' reasoning more closely, *see, e.g., Brindisi v. Barnhart,* 315 F.3d 783 (7th Cir.2003), *Steele,* 290 F.3d at 936, the ALJ's reasoning in this case is sufficient.

■ Finally, Hughes's last argument—that the ALJ did not adequately support his RFC finding—is not only waived because it was not presented to the district court, *see Shramek v. Apfel,* 226 F.3d 809, 811 (7th Cir.2000), but also unpersuasive. The ALJ refers to Dr. McCracken's RFC worksheet when explaining how he arrived at the conclusion that Hughes could lift 50 pounds occasionally and 25 pounds frequently. He then provides page cites to other record entries, such as a reference to Hughes redoing the basement of his home in July 2000, which support his RFC determination. This explanation is more than sufficient, as it is easy to track the ALJ's reasoning regarding his RFC finding. *See, e.g., Johansen v. Barnhart,* 2002 U.S.App. LEXIS 26452 (7th Cir.2003); *Nelson v. Apfel,* 131 F.3d 1228, 1237–38 (7th Cir.1997).

*CONCLUSION*

For the foregoing reasons, we AFFIRM the district court's judgment.