**Bruce LIPPART, Plaintiff–Appellant,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant–Appellee.**

No. 02–3537.

United States Court of Appeals, Seventh Circuit.

Argued March 4, 2003.

Decided April 17, 2003.

Before BAUER, EVANS, and
WILLIAMS, Circuit Judges.

### ORDER

Bruce Lippart appeals from the district court's order upholding the denial of his application for disability insurance benefits by the Social Security Administration ("SSA"). Lippart contends that the ALJ's decision is not supported by substantial evidence because the ALJ rejected the opinions of his treating physicians, discredited his complaints of pain, and relied on the Medical–Vocational Guidelines (known as the "grids") instead of his vocational expert. We affirm the district court's judgment.

### I. Background

#### A. Lippart's Medical History

In July 1998 Lippart injured his back while unloading furniture from a moving van, one of his duties as a moving van driver. A MRI of his spine revealed a large central and right paracentral disk extrusion with a central compression of the right L5 nerve root. Neurosurgeon Daniel Resnick performed a lumbar diskectomy on Lippart's spine, but when Lippart continued to experience pain in the weeks following his surgery, he underwent a reexploration of his lumbar wound, during which Dr. Resnick removed a "very large" disk fragment. Two weeks later, Dr. Resnick reported that he was very pleased with Lippart's progress, noting that his pain and posture were greatly improved. At Dr. Resnick's suggestion, Lippart attended physical therapy.

Over the next two months Lippart's condition continued to improve. He reported to Dr. Resnick that he was well enough to use a chainsaw to remove a tree limb and to carry shingles up to his roof. In October Dr. Resnick suggested that Lippart slowly ease back into work in November. Lippart, however, did not go back to work. Instead, he returned to Dr. Resnick, complaining that on the day after Thanksgiving he felt a sharp pain in his back when he extended his arm to point at his barn. He reported that the pain radiated down to his right leg. After an examination, Dr. Resnick noted that, despite this new episode of pain, Lippart's condition "seems to have improved remarkably." Nevertheless, Dr. Resnick recommended that Lippart undergo another MRI, but concluded after reviewing the results that there was no evidence of nerve root compression and that the root looked "fine."

The following month Lippart saw his treating physician, Dr. Muhammad Esmaili. He complained of back pain, stiffness, and radiation of pain to his right toe. Dr. Esmaili opined that, considering Lippart's stiffness and difficulty walking, he could not see how Lippart could return to work.

He advised Lippart to see Dr. Kris Chan for a spinal consultation.

In January 1999 Dr. Chan examined Lippart and noted his back stiffness and difficulty standing and sitting down. After reviewing Lippart's MRI scans, Dr. Chan concluded that, because Lippart's surgery was on his right side, nothing on Lippart's left side explained the pain across his lower back and down his left thigh. Dr. Chan assumed that such pain was "muscle pain and not a true radicular pain." Nevertheless, Dr. Chan concluded that Lippart was not ready to resume work as a truck driver and suggested that he continue to treat his back pain with ibuprofen, hot baths, and exercise.

Later that month Dr. Resnick explained to Lippart that he could not say when he could return to work because he did not know the extent of his pain or his job requirements. Dr. Resnick advised Lippart to rest and avoid activities that caused him pain. He suggested that Lippart take a higher dose of ibuprofen and indicated that a functional capacity examination ("FCE") could answer his questions regarding his ability to return to work.

In February 1999 physical therapist Kevin Beaver performed a FCE on Lippart. Beaver evaluated Lippart for his readiness to return to work as a "heavy truck driver," a "medium" level job:

> Mr. Lippart did not meet all the physical demands of a heavy truck driver as per the job standard. He met all U.S. Dept. of Labor strength demands for "light" work. He lifted 30# and carried 40# maximum. He performed in the "light" level work range with static bench height lifting and bench height dynamic lifting. He lifted below job standard for all dynamic lifting. He measured work day tolerances of 1–5 hours vs. 8 + hours/day for 7 of 7 mea-

sured worker interface and positional tasks.

Although Lippart could not work a full eight-hour day of medium level work, Beaver specifically found that Lippart's work day capacity of light work was "8 + " hours. Beaver also explained that Lippart performed the tests with some difficulty, noting increased pain, sweating, shortness of breath, and difficulty changing positions.

Dr. Chan reviewed Lippart's FCE and restricted him to "light work permanently with maximum lifting of 20 pounds." Dr. Chan also concluded that Lippart should avoid repetitive bending and estimated Lippart's permanent partial disability to be twelve percent of his body. Dr. Chan noted that Lippart had stopped taking ibuprofen because it no longer relieved his pain.

In May 1999 Dr. Esmaili examined Lippart and noted that his back problem had improved, though he still had trouble bending and reported being tired after a few hours of activity. Dr. Esmaili opined that Lippart could perform light work for three to four hours daily with frequent breaks. Two months later Dr. Esmaili noted that Lippart's back pain had reached a plateau and that his bending and movement had improved. He continued to believe that Lippart could perform three to four hours of light work with frequent breaks.

In the meantime, a state agency physician reviewed Lippart's medical evidence and concluded that he could lift twenty pounds occasionally, ten pounds frequently, stand and/or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and perform unlimited pushing and/or pulling. In July 1999 a second state agency physician reviewed the medical evidence and concurred with this assessment.

In February 2000 Dr. Esmaili noted that Lippart's back pain had been getting "more tolerable" and that Lippart was "increasingly active though he still has pain in the left leg and the left toes which is radiating from the lumbar spine." Two months later Dr. Esmaili recommended that Lippart see a physical therapist to evaluate his "physical capability as far as returning to work." Dr. Esmaili declined to complete a residual functional capacity ("RFC") questionnaire, deferring to the opinion of the physical therapist.

Lippart, however, did not see a physical therapist to complete the RFC questionnaire. Instead, Dr. Jeffrey Coe, an occupational medicine specialist who examined Lippart for worker's compensation purposes, completed the questionnaire. Dr. Coe opined that Lippart could occasionally lift twenty pounds and frequently lift ten pounds. He concluded that Lippart could walk two to four blocks at a time, sit for thirty minutes at a time, and stand for thirty minutes at a time. He further concluded that Lippart would need to walk approximately every thirty minutes and would need to take occasional, unscheduled breaks. Dr. Coe indicated that Lippart often experienced pain severe enough to interfere with his concentration. Finally, when answering the question of how long Lippart could "sit and stand/walk *total in an 8 hour working day* (with normal breaks)," Dr. Coe circled the choice "about 4 hours."

## B. Lippart's Social Security Application

In March 1999 Lippart applied for disability insurance benefits, alleging that he became disabled on July 14, 1998, due to back pain. The SSA denied his claim initially and upon reconsideration. Lippart then had a hearing before an ALJ at which he testified. He also submitted a statement describing his daily activities. Ac-

cording to that statement, Lippart wakes at 7:00 a.m., readies his children for school, plays card games on his computer, and sometimes starts a load of laundry. He then brings his children to school and works at a kennel for approximately two hours. There he mixes two fifteen-pound bags of meat with dry dog food and water, sweeps the floors, and performs other maintenance duties. Lippart then returns home, washes the dishes, and feeds his dog. After a half-hour nap, Lippart works on a "project" such as woodworking, building things for his home, working on his garage, pulling weeds, mowing the lawn, or raking leaves. While working on a project, Lippart will not lift more than twenty pounds, and he rests after two hours. In the afternoon Lippart returns to the kennel for about a half hour to clean up and play with the dogs. One evening per week Lippart meets with Boy Scouts for a den meeting. Since he injured his back, Lippart's Boy Scout duties are mainly administrative. Lippart noted that he has learned to live with his pain and that he notices it less when he concentrates on something else.

After the hearing, Lippart submitted a report from a vocational expert ("VE") who opined that there were no jobs that Lippart could perform because (1) he was unable to remain in any one physical position long enough to be truly productive; (2) he required unscheduled breaks throughout the workday lasting five to ten minutes each; and (3) his pain was often severe enough to interfere with his concentration. The VE cited many of Lippart's medical reports, but her conclusions relied heavily on Dr. Coe's RFC questionnaire.

After reviewing the medical evidence, Lippart's statement, and the VE's report, the ALJ denied Lippart's claim, using the familiar five-step analysis. *See* 20 C.F.R. §§ 404.1520; *Bowen v. Yuckert*, 482 U.S.

137, 140–42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001). First, the ALJ found that Lippart had not engaged in substantial gainful activity since his onset date and that his impairment was severe. He then concluded that, although Lippart did not automatically qualify for benefits by meeting a listed impairment, he could not perform his past work of driving a truck. At Step 5, however, the ALJ concluded that Lippart was not disabled because he could perform a full range of eight hours per day of "light work with the usual breaks" and that such an exertional capacity was consistent with the reports of Dr. Chan and Dr. Esmaili, the FCE, and Lippart's daily activities.

The ALJ rejected Dr. Coe's conclusion that Lippart must be able to change position every thirty minutes because it was not supported by objective medical findings and was inconsistent with Lippart's daily activities and the other medical evidence. The ALJ also rejected the VE's opinion because she relied on Dr. Coe's position-change requirement and had misread Dr. Coe's RFC questionnaire to conclude that Lippart could sit, stand, or walk for a total of only four hours a day. Instead of relying on the VE's opinion, the ALJ used the grids, which directed a finding of "not disabled" considering Lippart's age, education, work experience, and RFC of light work. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

After the ALJ denied his application and the Appeals Council denied review, Lippart filed suit in the district court. A magistrate judge found that the ALJ's decision was supported by substantial evidence, and the district court adopted that recommendation.

## II. Analysis

We will uphold an ALJ's decision that is supported by substantial evidence, but will remand the case if the decision contains legal error. *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir.2002). Evidence is substantial when it is sufficient for a reasonable person to conclude that the evidence supports the decision. *Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir.2000).

Lippart's primary argument is that substantial evidence does not support the ALJ's conclusion that he can perform eight hours of light work per day.[1] The ALJ based this conclusion on the FCE performed by Lippart's physical therapist as well as on Lippart's reported daily activities. Lippart, however, argues that the ALJ's conclusion is not supported by substantial evidence because, he says, the FCE limited him to five hours or less of light work per day and both Dr. Esmaili and Dr. Coe limited him to four hours of light work per day.

■ Substantial evidence supports the ALJ's conclusion that Lippart can perform eight hours of light work per day. First, Lippart misreads the FCE report. Although it states that Lippart "measured work day tolerances of 1–5 hours vs. 8+ hours/day of 7 of 7 measured worker interface and positional tasks," that statement refers to Lippart's ability to perform his past work as a truck driver. Moreover, the FCE report contains a chart listing Lippart's workday capacity for light work as "8+" hours, and the physical therapist reported that Lippart met all of the requirements for light work. Thus, the FCE

---

1. Light work involves occasionally lifting no more than twenty pounds with frequent lifting or carrying of objects weighing up to ten pounds, or it may involve infrequent lifting but require substantial walking or standing or sitting with the pushing or pulling of arm or leg controls. 20 C.F.R. § 404.1567(b).

report supports the ALJ's conclusion that Lippart can perform eight hours of light work per day.

Lippart is also mistaken in characterizing Dr. Esmaili's limitation on his workday capacity. Although in May 1999 Dr. Esmaili opined that Lippart could perform "some light duty work perhaps 3 to 4 hours daily with frequent breaks," he never restricted Lippart's workday capacity. In fact, when asked to complete a RFC questionnaire, Dr. Esmaili declined, deferring instead to the opinion of the physical therapist. And the only physical therapist who evaluated Lippart concluded that he could perform eight hours of light work per day. Moreover, in February 2000 Dr. Esmaili reported that Lippart's "pain has been getting more tolerable and he is becoming increasingly active although he still has pain in the left leg and the left toes which is radiating from the lumbar spine." Thus, Dr. Esmaili's opinions are consistent with the ALJ's conclusion that Lippart could perform eight hours of light work.

The only doctor who suggested that Lippart could not work a full eight-hour day was Dr. Coe. The ALJ, however, found that Dr. Coe's report was ambiguous. When answering the question of how long Lippart could "sit and stand/walk *total in an 8 hour working day* (with normal breaks)," Dr. Coe circled the choice "about 4 hours." The ALJ interpreted Dr. Coe's answer as allowing four hours sitting and four more hours standing or walking because "[a]ny other interpretation would leave the claimant lying down for 4 to 8 hours [and][n]one of his self-reports show he does this or that it is necessary." The ALJ's interpretation appears to be unreasonable because the question asked how long Lippart could sit, stand, and walk *"total in an 8 hour working day"* and did not have spaces for separate answers for each activity. Nevertheless, substantial evidence supports the ALJ's rejection of

the other interpretation–namely, that Lippart can sit, stand, and walk for only four hours per day. None of Lippart's prior medical reports require him to lie down for four hours per day, and Lippart's statement of his daily activities does not include such extended rest periods. Moreover, Lippart's physical therapist concluded that he could perform eight hours of light work per day.

Lippart argues that the ALJ must give Dr. Coe's opinion controlling weight because he was his treating physician. *See Dixon,* 270 F.3d at 1177. But Dr. Coe was not Lippart's treating physician. He examined Lippart only once, and that examination occurred after Lippart had already applied for social security benefits. Moreover, Dr. Coe provided no treatment to Lippart and examined him solely to support his application for worker's compensation benefits and to complete the RFC questionnaire. *See* SSR 96–2p (controlling weight given only to opinions from a "treating source" as defined in 20 C.F.R. § 404.1502); 20 C.F.R. § 404.1502 ("We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability."). In any event, Dr. Coe's opinion is inconsistent with the physical therapist's FCE and Lippart's daily activities. *See Johansen v. Barnhart,* 314 F.3d 283, 287 (7th Cir.2002) (treating physician's opinion not entitled to controlling weight if inconsistent with substantial evidence in record); *Butera v. Apfel,* 173 F.3d 1049, 1056–57 (7th Cir.1999) (treating physician's opinion not entitled to controlling weight because physician examined patient only once and opinion was based in part on patient's subjective complaints).

Lippart next contends that the ALJ did not properly evaluate his statements of

pain in finding that they were not credible. If a claimant's subjective complaints of pain are not supported by objective medical evidence an ALJ must consider the following factors in determining his credibility: (1) the nature and intensity of the claimant's pain; (2) precipitating and aggravating factors; (3) dosages and effectiveness of medication; (4) treatment other than medication; (5) functional restrictions; and (6) the claimant's daily activities. *See Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001); *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994). This court will not overturn an ALJ's credibility determination unless it is patently wrong. *Zurawski*, 245 F.3d at 887.

The ALJ here considered Lippart's pain in light of these criteria. He cited various medical reports documenting Lippart's pain, but concluded that they did not establish that his pain rendered him disabled. The ALJ relied in particular on Dr. Esmaili's February 2000 report that Lippart's pain was becoming more tolerable. Moreover, Dr. Esmaili, Dr. Chan, and Lippart's physical therapist all noted Lippart's pain, but found him fit for light work. *See Walker v. Bowen*, 834 F.2d 635, 641–42 (7th Cir.1987) (ALJ did not err in discrediting claimant's complaints of pain because two doctors noted his pain but nonetheless found him fit for sedentary work). The ALJ also noted that bending and sitting for long periods of time aggravated Lippart's pain, but he took those factors into account in restricting Lippart to light work, which requires only occasional bending and includes the normal amount of breaks in an eight-hour day. The ALJ also considered that Lippart did not use pain relieving measures such as physical therapy, home exercise, ice packs, heat, or a TENS unit. And although Lippart stopped taking ibuprofen because it no longer relieved his pain, he never used any medication intended to treat severe pain. *See Powers v. Apfel*, 207 F.3d 431, 435–36

(7th Cir.2000) (ALJ properly considered claimant's failure to take medication intended to treat severe pain).

The ALJ also thoroughly discussed Lippart's daily activities, which not only included minimal household chores such as washing dishes and preparing dinner, but also included mixing two fifteen-pound bags of raw meat with dog food, woodworking, pulling weeds, raking leaves, and mowing the lawn. Although minimal daily activities do not undermine a claim of disabling pain, *Zurawski*, 245 F.3d at 887, Lippart's activities appear to be more than minimal, *see Johansen*, 314 F.3d at 288 (doubting the minimal nature of "performing [a] home exercise and traction program, grocery shopping, doing laundry, driving a car, and walking one mile daily"). Thus, the ALJ considered the relevant factors in discrediting Lippart's complaints of pain, and substantial evidence supports the ALJ's conclusion that Lippart can perform the full range of light work.

Lippart's final argument is that the ALJ erred in relying on the grids, instead of his VE, in determining whether there were jobs in the economy he could perform. An ALJ may not use the grids when a claimant has a nonexertional limitation that "might substantially reduce a range of work an individual can perform." *Zurawski*, 245 F.3d at 889. The mere allegation of such a limitation, however, does not automatically preclude use of the grids. If the ALJ finds that the nonexertional limitation is not credible or severe enough to restrict a full range of gainful employment, then the grids may be used. *Luna*, 22 F.3d at 691–92; *Nelson v. Sec'y of Health and Human Servs.*, 770 F.2d 682, 685 (7th Cir.1985). Lippart contends that he has three nonexertional limitations precluding use of the grids: (1) Dr. Coe's restriction against repetitive bending, thus disallowing repetitive stooping; (2) his severe pain; and (3) Dr. Coe's conclusion that Lippart's

pain often interferes with his concentration.

■ Substantial evidence supports the ALJ's finding that Lippart's claimed nonexertional limitations did not significantly impact his ability to perform the full range of light work. First, Social Security Ruling 83–14,[2] a guideline for applying the grids, provides that occasional stooping does not restrict a full range of light work. SSR 83–14, Titles II and XVI: Capability To Do Other Work–The Medical–Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments (''[T]o perform substantially all of the exertional requirements of most ... light jobs, a person ... would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job'')); *see also Frustaglia v. Sec'y of Health and Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) (ALJ properly relied on grids even though claimant could not perform repeated bending). Thus, because Lippart can stoop occasionally, his restriction against repetitive bending was not severe enough to prevent the ALJ from using the grids. Next, an ALJ may rely on the grids if substantial evidence supports his conclusion that a claimant's pain is not disabling and does not interfere with his ability to work. *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir.1989). As discussed above, the ALJ here reasonably found that Lippart's pain was not disabling. Thus, Lippart's complaints of pain did not prevent the ALJ from using the grids.

Finally, substantial evidence supports the ALJ's rejection of Dr. Coe's conclusion that Lippart's pain often interfered with his concentration. Dr. Coe did not support his conclusion with objective medical evidence, and it is inconsistent with Lippart's daily activities, such as his ability to do paper work, complete administrative tasks for the Boy Scouts, and play computer games. Moreover, Lippart admitted that his pain is less severe when concentrating on a task. And none of his numerous other medical reports indicate that he has a concentration problem. Thus, because Lippart suffered no significant nonexertional limitations, the ALJ properly used the grids without relying on the testimony of the VE.

AFFIRMED.

2. The Commissioner relies on SSR 85–15 to prove that Lippart's inability to bend repeatedly did not restrict a full range of light work and thus did not prevent use of the grids. SSR 85–15, however, applies when a claimant has only nonexertional impairments. SSR 85–15, Titles II and XVI: Capability To Do Other Work–The Medical–Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments. Because Lippart contends that he has both exertional and nonexertional impairments, SSR 83–14 applies.